

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00379-CV

_____

IN THE INTEREST OF M.S., A CHILD

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-651196-18

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellants Mother and Father appeal the trial court's order terminating their parental rights to their daughter, M.S. In three issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that she voluntarily signed an irrevocable affidavit of relinquishment of her parental rights to M.S.; that the evidence is legally and factually insufficient to support the trial court's finding that her relinquishment affidavit was not the product of duress or coercion; and that the trial court abused its discretion by denying her motion for new trial. In his own three issues, Father argues that the trial court erred by finding that the parties in this case had reached an agreement regarding this case's disposition; that the trial court erred by finding that—without evidence of fraud, duress, or coercion—he voluntarily signed an irrevocable affidavit of revocation of his parental rights to M.S.; and that the trial court abused its discretion by "denying the Motion for New Trial." We will affirm.

## II. BACKGROUND

On October 17, 2017, the Department of Family and Protective Services (the Department) received a report of neglectful supervision regarding two children—A.G. and M.S. Both A.G. and M.S. are Mother's biological children, and M.S. is Father's biological child. On October 30, 2017, after making what the Department deemed reasonable efforts to prevent the need for removal of the children from Mother's and

Father's care, the Department filed its original petition seeking to terminate Mother's parental rights to M.S. and A.G. and to terminate Father's parental rights to M.S. Nearly a year later, on October 18, 2018, this suit proceeded to a bench trial.

### A. Trial Proceedings

At trial, Lynne Eger, a pediatric infectious disease physician at Cook Children's Hospital, testified that Mother started prenatal care late. Eger also said that M.S. tested positive for methamphetamine when she was born on September 27, 2017, indicating that Mother had used methamphetamine during her pregnancy. Eger averred that M.S. was at high risk to contract HIV because Mother carried the virus. Eger said that at M.S.'s two-week medical checkup, Mother did not allow hospital personnel to draw M.S.'s blood or do any labs but instead Mother left early saying that she would be back in a few days to complete the exam and labs. However, she did not return. Eger recalled that Mother also did not bring M.S. to her four-week checkup as she had been advised by doctors to do.

By Eger's account, despite Mother already having birthed one child while infected with HIV, Mother had not properly taken prescribed medications during her pregnancy to help prevent the transfer of HIV to M.S., and after her birth, Mother was not dispensing medications properly to M.S. in efforts to prevent her from possibly becoming infected. Eger said that despite repeated calls from hospital personnel asking Mother to bring M.S. to the hospital for checkups and for a determination of whether M.S.'s medications needed to be altered, Mother would not

3

bring M.S. to the hospital. This lack of care for M.S. prompted Eger to file a report of medical neglect with the Department.

Sylvia Martinez, a social worker at Cook Children's who works in the infectious disease clinic, also testified that Mother did not allow hospital personnel to conduct labs at the two-week checkup and that there was already an open case with the Department prior to M.S.'s birth. According to Martinez, despite numerous conversations over the phone with hospital staff and the multiple rescheduling of M.S.'s lab work, Mother failed to return M.S. for her needed labs. Like Eger had testified to, Martinez testified that Mother also did not bring M.S. to her scheduled four-week checkup. After failing to come to that appointment, Martinez said that she spoke with Mother by phone. By Martinez's account, Mother informed Martinez that she would not be returning to Cook Children's and that she had a new doctor for M.S. When Martinez inquired about M.S.'s new physician so that she could forward M.S.'s medical records, Mother responded that M.S. was her baby and Mother would do what she wanted to do. Martinez said that three days after Mother missed the four-week appointment, a Department caseworker brought M.S. to Cook Children's so that M.S. could get her checkup and lab work. Martinez averred that she had never seen nor spoken to Father.

Robert Matlack, a detective with the City of Benbrook Police Department, testified that he knew Mother and Father because he had investigated them multiple times for forgery in June and August of 2018. At some time during his investigations,

he procured arrest warrants for Mother and Father. Matlack eventually arrested Mother, but Father was not present when Matlack arrested her—another officer later arrested him. After arresting Mother, Matlack took her through standard booking procedures. Part of these procedures is to ask the arrestee whether she is infected with any communicable diseases. Mother told Matlack that she had none and that she had never tested positive for HIV. Further booking revealed that Mother had Xanax and two different types of HIV medications in her purse. Mother originally said that the medications were her prenatal vitamins and that he could dispose of them. After Matlack had Poison Control positively identify the medications, he asked Mother again if she had any communicable diseases. Mother again said that she was not infected with HIV. Mother was unable to provide a prescription for the Xanax, although she claimed that she had been prescribed the drug.

Rachel Gonzalez, a former investigator for the Department who had been assigned to M.S. and A.G.'s case, testified that she first began to investigate M.S.'s circumstances because on the day of M.S.'s birth, hospital personnel had made a "reason to believe" allegation that Mother had been medically neglecting M.S. Specifically, the Department became involved with M.S. because she had tested positive for benzodiazepines and amphetamines at birth. Through her investigation, Gonzalez learned that Mother also had tested positive for benzodiazepines and amphetamines at the time of M.S.'s birth. When Gonzalez asked Mother why she and M.S. had tested positive for these drugs, Mother said that the results were caused by

her use of Adderall. Gonzalez informed Mother that Adderall would not explain the positive benzodiazepines and amphetamines results, but Mother responded that she did not believe Gonzalez and reasserted that her test results were the result of her having taken Adderall. Gonzalez said that she later learned that Adderall is an inappropriate drug to take while pregnant because it is unhealthy for the fetus.

In addition to Mother's drug use, Gonzalez also discussed Father's drug use at trial. As part of her investigation, Gonzalez attempted to get Mother and Father to submit to drug testing, but despite having scheduled and planned for the two to submit to drug testing, Mother and Father never submitted to testing. Because of their unwillingness to submit to testing, the Department moved for multiple show-cause hearings wherein a trial court twice ordered Mother and Father to submit to drug testing, but they did not submit.

Gonzalez said that Mother would get upset and frustrated when confronted with her drug use and that she would not admit to illegal drug use. Gonzalez also averred that Mother was not forthright about having HIV, and she was inconsistent with her answers regarding whether Father knew of her HIV status.

Later during her investigation, Gonzalez learned that the hospital had ordered a meconium drug screen of M.S. and that the screen came back positive for methamphetamines. When Gonzalez initially attempted to visit Mother and Father at their home, the couple refused her access, but Gonzalez was ultimately allowed to inspect the home after the Department had M.S. and A.G. removed. Eventually,

6

according to Gonzalez, the Department implemented a safety plan in an effort to keep M.S. with Mother and Father, but despite the plan's requirement that the parents' contact with M.S. be supervised twenty-four hours a day, Mother would attend functions, including doctor visits, without the assigned supervisor, her own mother.

Gonzalez also stated that the Department had previously investigated Mother's care of A.G., but the Department was unable to make a determination because Mother would not cooperate with drug testing. Gonzalez said that there had also been a reason to believe Mother was neglectfully supervising A.G. the previous year when Mother had attempted suicide but that allegation also went unresolved because there was no positive evidence that A.G. was with Mother at the time of her suicide attempt.

Regarding Father, Gonzalez said that he was not willing to take the initiative to ensure that M.S. made her doctor appointments, and he did not attempt to remove M.S. from dangerous situations like Mother's methamphetamine use in the family's home.

By Gonzalez's account, M.S. and A.G. were eventually removed from Mother's and Father's care a little more than a month after M.S.'s birth because of medical neglect, the parents' drug use, and their previous history with the Department.

After Gonzalez testified, and after a discussion between the trial court and the attorneys, the court recessed for an hour. Upon returning, the trial court asked if the

7

trial should proceed, but Mother's attorney, Crystal Gayden, informed the trial court at that time that Mother and Father had agreed to sign irrevocable affidavits of relinquishments regarding their rights to M.S. Both Mother's and Father's attorneys explained to the trial court that both parents were relinquishing their rights to M.S. and that Mother had reached an agreement concerning her ability to visit A.G., whom the parties had agreed would be placed with her biological father. Shortly thereafter, the trial court took judicial notice that Father and Mother had signed irrevocable affidavits of relinquishment. The trial court also took judicial notice of the affidavits and had them file marked and made part of the record. The trial court found, based on the affidavits, that Father's and Mother's parental rights to M.S. were terminated. The trial court also found that termination of Father's and Mother's parental rights to M.S. was in M.S.'s best interest. The trial court further ordered that A.G.'s case be severed from M.S.'s, and the trial regarding A.G. continued.

## B. Motion for New Trial Hearing

After the trial court entered judgment regarding M.S., Mother filed a motion for new trial. At the motion for new trial hearing, Mother telephonically testified that Gayden, her original trial attorney, had spoken to her at the break in trial and told her that the trial judge was tired and wanted her and Father to "settle" the case and that the Department wanted her to sign over her rights to M.S. if she "wanted to keep a relationship with" A.G. Mother averred that she signed her affidavit because it was her "only option" because she had been told by Gayden that if she did not sign the

8

affidavit, the trial judge was going to terminate her parental rights to A.G. and Father's older son.[1] She said that she was also told that if she didn't sign the affidavit, she would never see A.G. again. Mother stated that the thought of losing her two other children made her feel threatened and unable to withhold her consent and that is why she signed the affidavit. According to Mother, although she had initialed all the pages of her affidavit twice and signed it twice, she did not have the opportunity to read the affidavit. But Mother admitted that she asked Gayden questions about the affidavit.

Mother further averred that no one physically forced her to sign the affidavit but that she had initialed and signed it because Gayden told her that she needed to act mature and sign the affidavit "the correct way." Mother said that her conversation with Gayden regarding the affidavit occurred in front of her, Gayden, Father, and Father's trial counsel. Mother averred that after that, two of Gayden's paralegals came in the room and told her the same thing that Gayden had told her; that the trial judge wanted her to settle and the Department was offering to not pursue termination regarding A.G. and Father's older son if she would sign the relinquishment affidavit. Mother stated that she even left the room where Gayden and her paralegals were because she needed a minute for herself but that Gayden and the others followed her into another room and told her that if she did not make a decision the trial judge

---

[1]The record indicates that Father has an older child who was not a child subject to this suit and is not Mother's biological child.

9

would make the decision for her by terminating her parental rights to all three children.

Gayden also testified at the hearing. Gayden said that the reason that Mother had signed the affidavit twice was because Gayden was not present when Mother signed it the first time and Gayden wanted to witness Mother signing the affidavit. Gayden also said that she went over the affidavit "numerous times" with Mother prior to Mother signing it, that she emphasized the portion in the affidavit that Mother would be signing it voluntarily, and that she went over the consequences with Mother of signing the affidavit. Gayden stated that she went over the affidavit "page by page" and that before moving to another page she made sure that Mother understood what each page meant. By Gayden's account, when she discussed the affidavit page by page, she, Mother, two of her staff members, Father, and Father's attorney were all present.

Gayden also testified that Father "encouraged [Mother], begged her, to sign" the affidavit. According to Gayden, Father told Mother that he understood how hard it was to sign the relinquishment because he had done so in the past relating to one of his other children but that he thought it was the best way for Mother to not put her relationship with A.G. in jeopardy.

Gayden also averred that Mother had signed the affidavit voluntarily. Specifically, Gayden said that when Mother signed the affidavit the second time, it was in the courtroom and she, a notary, and other attorneys were also present.

10

Gayden denied threatening Mother in any way. Gayden said that she did not follow Mother around in an effort to get her to sign the affidavit, that she was ready to proceed with trial, and that "the only reason why [they] engaged in additional communications . . . about the affidavit is because [Mother] continued to ask questions about the affidavit."

Gayden also denied threatening that Mother would lose rights to her other children, but Gayden did acknowledge that she had informed Mother that trial was not proceeding favorably, and that if the trial continued, there was a chance that Mother would lose her parental rights to both M.S. and A.G. Gayden also acknowledged that she did inform Mother that some of the things that Mother wanted to testify to if trial went forward could put her parental rights to any of her other children in jeopardy, but Gayden said that that conversation had nothing to do with the affidavit and "everything to do with what [Mother] was going to testify to." Gayden stated that neither she nor anyone from her office told Mother that the trial judge wanted her to settle the case. She also denied telling Mother that the trial judge was tired. Gayden averred that she had informed Mother that the State was willing to let Mother maintain some rights to A.G. if Mother voluntarily relinquished her rights to M.S. Gayden also averred that Mother understood the consequences of signing the affidavit versus continuing with trial.

Even though the hearing was regarding Mother's motion for new trial, Father's attorney was present at the hearing and Father, like Mother, testified at the hearing

11

telephonically. And it was Father's attorney who called Father to testify. Father testified that he was present when Mother signed her affidavit. By Father's account, Gayden had told Mother that she "needed to sign" the affidavit or face the possibility of losing A.G. "completely." Father acknowledged that he told Mother that she needed to sign her affidavit because "of [A.G.]." According to Father, Gayden did not go over the affidavit with Mother when she signed it and instead Gayden told Mother "that she needed to sign it, or they could come in and take [Father's] son," who was not part of these termination proceedings and is not Mother's biological child, and that she needed to salvage as much of a relationship as she could with A.G. Father said that Mother did not want to sign the affidavit and kept slamming it down on a table, but eventually she did sign it because "[s]he felt like she had no other choice." Father also said that both his attorney and Gayden were pressuring him to pressure Mother into signing her affidavit. At the end of the hearing, both Mother's and Father's attorneys stated that they had closed. The trial court denied Mother's motion for new trial. As part of its findings of fact and conclusions of law, the trial court found that both Mother and Father had voluntarily signed their respective affidavits of relinquishments. This appeal followed.

## III. DISCUSSION

As explained above, both Mother and Father are challenging the trial court's order terminating their parental rights to M.S. Specifically, Mother and Father are both challenging the court's finding that they voluntarily signed their relinquishment

12

affidavits. They both are also arguing that the trial court erred by denying Mother's motion for new trial. Neither parent is challenging the trial court's finding that termination of their parental rights was in M.S.'s best interest.

## A. Standard of Review, Evidentiary Standards, and the Law Regarding Affidavits of Voluntary Relinquishment

Appellate courts review a trial court's decision denying a motion for new trial under an abuse of discretion standard. *Dir., State Emps. Workers' Comp. Div. v. Evans*, 889 S.W.2d 266, 268 (Tex. 1994). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). As part of our review, we give almost total deference to the trial court's determination of historical facts that are supported by the record, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between

a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Similarly, in reviewing the evidence for factual sufficiency, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the Department proved the statutory grounds for termination. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1) and that termination is in the best interest

14

of the child. Tex. Fam. Code Ann. § 161.001(b); *see E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Specifically, a trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that termination is in the child's best interest and that the parent has voluntarily executed "an unrevoked or irrevocable affidavit of relinquishment of parental rights." Tex. Fam. Code Ann. § 161.001(b)(1)(K), (b)(2); *see also In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014) ("[I]mplicit in section [161.001(b)(1)(K)] is the requirement that the affidavit of parental rights be voluntarily executed.").

An involuntarily executed affidavit is a complete defense to a termination suit based on section 161.001(b)(1)(K). *See K.M.L.*, 443 S.W.3d at 113; *see also In re C.E.*, No. 02-14-00054-CV, 2014 WL 3866159, at *5 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.). An affidavit is executed voluntarily when it is executed knowingly and intelligently. *See K.M.L.*, 443 S.W.3d at 113. A direct attack on a judgment terminating parental rights based on an unrevoked affidavit of relinquishment "is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit." Tex. Fam. Code Ann. § 161.211(c); *see also Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000) ("Since an affidavit of relinquishment waives rights of constitutional magnitude, it must be made voluntarily, knowingly, intelligently, and with full awareness of the legal consequences.") (citation omitted)), *pet. denied*, 53 S.W.3d 684 (Tex. 2001) (per curiam).

Evidence that an affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with section 161.103 of the Family Code is prima facie evidence of its validity. *In re D.R.L.M.*, 84 S.W.3d 281, 296 (Tex. App.—Fort Worth 2002, pet. denied). Once the proponent of the affidavit has met that burden, the burden then shifts to the opponent of the affidavit to establish by a preponderance of the evidence that the affidavit was executed as a result of fraud, duress, or coercion. *Id.* at 293; *Vela*, 17 S.W.3d at 758; *see also* Tex. Fam. Code Ann. § 161.211(c).

Coercion occurs if someone is compelled to perform an act by force or threat. *In re D.E.H.*, 301 S.W.3d 825, 828 (Tex. App.—Fort Worth 2009, pet. denied). Duress occurs when, due to some kind of threat, a person is incapable of exercising free agency and unable to withhold consent. *Id.* at 829. Fraud may be committed through active misrepresentation or passive silence and is an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage. *Id.* The burden of proving such wrongdoing is on the party opposing the affidavit. *Id.* at 830.

## B. Mother's Issues on Appeal

In three issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that she voluntarily signed her irrevocable affidavit of relinquishment of her parental rights to M.S.; that there is

16

legally and factually insufficient evidence to support the trial court's finding that her relinquishment affidavit was not the product of duress or coercion; and that the trial court abused its discretion by denying her motion for new trial.

### 1. The Voluntariness of Mother's Affidavit

In her first issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that she voluntarily signed her irrevocable affidavit of relinquishment of her parental rights to M.S. Mother does not dispute that her affidavit fulfills the formalities of Family Code Section 161.103 and is therefore a proper relinquishment affidavit. *See* Tex. Fam. Code Ann. § 161.103. The State argues that there is ample evidence to support the trial court's finding. We agree with the State.

At the motion for new trial hearing, Mother testified that she did not have the opportunity to review the relinquishment affidavit despite initialing each page twice and signing it twice. She also said that she did not fully comprehend the ramifications of signing the affidavit and that she felt pressured by Gayden and her staff to sign it. Father stated that Gayden never went over the affidavit with Mother. Gayden, however, averred that she went over the affidavit numerous times with Mother and discussed its consequences, as well as the consequences of proceeding with the termination trial regarding both M.S. and A.G. Gayden further testified that Mother's decision to sign her affidavit was voluntary and that she did not pressure Mother into signing it. As the factfinder, the trial court was free to give credence to Gayden's

17

testimony and disbelieve Mother's and Father's testimony. *See Hanners v. State Bar of Tex.*, 860 S.W.2d 903, 908 (Tex. App.—Dallas 1993, writ dism'd) ("The trial court serves as fact finder at a hearing on a motion for new trial and, accordingly, is the sole judge of the witnesses' credibility.").

Furthermore, Gayden's testimony is not the only evidence that Mother signed the affidavit. Indeed, in the affidavit itself, Mother swore that she was signing it freely and voluntarily; that she was permanently relinquishing all of her rights and duties with respect to M.S.; that she understood that the affidavit was irrevocable; and that even if she changed her mind, she could not force the agency to destroy, revoke, or return the relinquishment affidavit. Mother also acknowledged receiving a copy of the signed affidavit. Mother's signature appears on the affidavit twice, and she initialed each page twice.

As Mother even acknowledges, this court has held that a fully complied with affidavit itself which contains language acknowledging the voluntariness of the affidavit along with a caseworker's testimony that she had no reason to believe the parent's affidavit was involuntary, is sufficient to show that the parent signed the affidavit voluntarily. *In re B.H.*, No. 02-15-00155-CV, 2015 WL 5893626, at *4–5 (Tex. App.—Fort Worth Oct. 8, 2015, no pet.) (mem. op.).

But unlike in *B.H.*, where it was a caseworker testifying that a parent had signed an affidavit voluntarily, here, Mother's attorney testified that she had fully explained the affidavit numerous times to Mother, that she explained each page of the affidavit

18

with Mother and made sure she comprehended each page before proceeding to the next page, and that Mother signed the affidavit voluntarily.

It is also relevant that Mother's affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with Section 161.103 of the Family Code and, therefore, is prima facie evidence of its validity. *In re K.D.*, 471 S.W.3d 147, 156 (Tex. App.—Texarkana 2015, no pet.).

We conclude that in light of the fact that the record contains Gayden's testimony about Mother's voluntariness as well as Mother's statements in the affidavit reflecting her voluntariness, the trial court could have rationally formed a firm belief or conviction that the affidavit was voluntarily executed. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother voluntarily signed her affidavit of relinquishment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K); *see also B.H.*, 2015 WL 5893626, at *5 (holding that testimony from caseworker that mother had signed affidavit voluntarily coupled with statements in affidavit wherein mother acknowledged the voluntariness of her signing constituted legally and factually sufficient evidence to support trial court's relinquishment finding). We overrule Mother's first issue.

### 2. No Coercion or Duress

In her second issue, Mother argues that there is legally and factually insufficient evidence to support the trial court's finding that her relinquishment affidavit was not the product of duress or coercion. Mother argues it was coercive and threatening to

be told that only if she relinquished her rights to M.S. she could maintain some parental rights to A.G. Mother also claims that the Department's offer violated the Department's own policies and that this is evidence of the illegality of the transaction offered to Mother. We conclude that the evidence is legally and factually sufficient to support the trial court's finding that Mother signed her affidavit without coercion or duress.

At the motion for new trial hearing, Mother testified that Gayden spoke to her at the break in trial and told her that the trial judge was tired and wanted her and Father to "settle" the case and that the Department wanted her to sign over her rights to M.S. if she "wanted to keep a relationship with" A.G. Mother averred that she signed her affidavit because it was her "only option" because she had been told by Gayden that if she did not sign the affidavit, the trial judge was going to terminate her parental rights to A.G. and Father's older son[2] and that she might possibly never see A.G. again. Mother stated that the thought of losing her two other children made her feel threatened and unable to withhold her consent and that is why she signed the affidavit. But Gayden testified that she did not tell Mother that the trial court wanted the case settled, and she did not tell Mother that the trial judge was tired. Gayden recalled that she had explained to Mother that trial was not proceeding in a positive manner and that if Mother testified to some of the things that she wished to, it would

---

[2]There is no evidence in the record that Mother has any parental rights to Father's older child.

put her relationship with her other children in jeopardy. Gayden said, however, that this counsel was in the context of what Mother wished to testify about and not about her affidavit. The trial court was free to believe Gayden's version of events and to reject Mother's recollection entirely. *Hanners*, 860 S.W.2d at 908.

Mother further testified, and argues now on appeal, that two of Gayden's assistants followed her when she went to clear her head regarding the affidavit and that the assistants told her that she had to sign the affidavit if she ever wanted to see A.G. again. Mother argues that even though Gayden said that she did not follow Mother, there is no evidence to contradict her testimony that her assistants did. But the compelling evidence regarding this argument is Gayden's testimony that she was not present when Mother signed the affidavit the first time and that once Mother returned to court, where Gayden said she was prepared to move forward with trial, she insisted that Mother sign and initial the affidavit in her presence a second time and that there were multiple witnesses to this second signature. Moreover, Mother testified that no one physically forced her to sign the affidavit; rather, Mother said that it was the psychological pressure of feeling she was choosing between her children that overbore her consent.

But the fact that a parent felt pressured or was emotionally upset and under stress when signing an affidavit of relinquishment does not render that affidavit involuntary or demonstrate that it was the product of duress or coercion. *See D.E.H.*, 301 S.W.3d at 830 (holding that mother's showing that her uncertainty, confusion,

21

and anguish over her limited options created a feeling that she was pressured into signing the affidavit did not demonstrate that she executed the affidavit as a result of coercion, fraud, or duress); *In re N.P.T.*, 169 S.W.3d 677, 679–81 (Tex. App.—Dallas 2005, pet. denied) (reasoning that father who signed relinquishment affidavit as part of a plea bargain agreement did so voluntarily even though he was under pressure to decide). And the potential loss of rights to other children does not render a relinquishment automatically involuntary. *See Wall v. Texas Dep't of Family and Protective Servs*, 2006 WL 1502094, at *2–3 (Tex. App.—Austin June 2, 2006, no pet.) (mem. op., not designated for publication) (holding that relinquishment affidavit was voluntary and not product of fraud, duress, or coercion despite pregnant mother being told that she would likely lose at a termination trial and that risking trial might establish new grounds justifying termination of her parental relationship with her unborn child).

Mother ultimately argues that the Department could not have offered the bargain that it did because it violates its own internal rules.[3] Specifically, Mother

---

[3]Mother has requested that this court take judicial notice of the Department's policy that prohibits a caseworker from offering to return one child to a parent in exchange for the parent relinquishing her parental rights to another child. *See* DFPS Policy Handbooks, Child Protective Services Handbook § 5573.3 (Mar. 1, 2018) (accessible at https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_5560.asp#CPS_5 573_3). We do have the power to take judicial notice of the policy. *See* Tex. R. Evid. 201(d); *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Texas*, 878 S.W.2d 598, 600 (Tex. 1994) ("A court of appeals has the power to take judicial notice for the first time on appeal."). But even if this court were to take judicial notice of the Department's policy, there is little evidence in this record that the agreement that Mother contends

22

argues that the Department's own handbook forbids a Department caseworker from offering a parent the ability to keep rights to one child in exchange for the relinquishment of rights toward another. The State argues, and Mother agrees, that there is no evidence in this case that a caseworker offered the bargain to Mother. Mother nonetheless argues that although the Department's offer did not "violate the letter of the law . . . it violated the spirit of the law." But a department's violation of its own internal policy is not a violation of the law. *See Bekendam v. State*, 441 S.W.3d 295, 304 (Tex. Crim. App. 2014) (holding that because expert's testimony complied

---

she was operating under actually occurred. Indeed, other than Mother's testimony, the only corroboration of her version of the events is a hearsay statement offered by Gayden. In her testimony, Gayden stated that there had been "discussion" between the State and Gayden wherein the State "was offering . . . for [Mother] to terminate her rights voluntarily to [M.S.]; however, [the State] would be willing to keep her rights to [A.G.]" However, no written offer or agreement appears anywhere in the record. *See* Tex. R. Civ. P. 11. ("Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.").

The fact that the trial court severed A.G.'s case from M.S.'s case and continued with A.G.'s trial after Mother entered her affidavit supports that there was no formal Rule 11 agreement between the parties, which this court would expect to be a part of the record had there been an actual offer and acceptance of the agreement Mother claims she was acting under. *See Reyna v. Dep't of Family & Protective Servs.*, No. 01–05–00985–CV, 2006 WL 1098805, at *3 (Tex. App.—Houston [1st Dist.] Apr. 27, 2006, no pet.) (mem. op.) ("Appellant does not, however, identify any document in the record constituting a Rule 11 agreement nor provide citation to the record to support her contention that a Rule 11 agreement existed."). Our resolution of this case should not be construed to reflect that a reviewing court could not consider the Department's policy in assessing whether sufficient evidence exists to support a trial court's order terminating parental rights based on a voluntary affidavit of relinquishment.

with rules of evidence the trial court did not err by allowing the expert's testimony even though it conflicted with the department's own policy and threshold requirements for putting drug test results into a report). Furthermore, this was not an argument made by Mother in her motion for new trial, and Mother never sought to introduce the Department's policy into evidence at the hearing.

We conclude that the trial court could have rationally formed a firm belief or conviction that Mother executed her affidavit without the influence of duress or coercion. *See R.B.*, 225 S.W.3d 798, 805–06 (Tex. App.—Fort Worth 2007, no pet.) (holding that parents acted voluntarily and without duress, fraud, or coercion in executing their affidavits even though the evidence supported that they were emotionally distressed and had been placed under "considerable pressure"). Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother signed her affidavit of relinquishment without duress or coercion. We overrule Mother's second issue.

### 3. No Abuse of Discretion by Overruling Mother's Motion for New Trial

In her third issue, Mother argues that the trial court abused its discretion by overruling her motion for new trial. Specifically, Mother argues that she conclusively proved the involuntariness of her affidavit because of duress or coercion and that the trial court's findings regarding voluntariness, duress, and coercion are against the great

24

weight and preponderance of the evidence and thus the trial court abused its discretion by denying Mother's motion for new trial. We disagree.

We have held that the trial court did not err by determining that the evidence legally and factually supports the trial courts' finding that Mother executed her affidavit voluntarily and that it was not the product of duress or coercion. Thus, the trial court did not abuse its discretion by denying Mother's motion for new trial. *See In re A.P.*, No. 02-15-00176-CV, 2015 WL 7304051, at *8 (Tex. App.—Fort Worth Nov. 19, 2015, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by denying father's motion for new trial when father had not proven that relinquishment affidavit was involuntary and executed under duress). We overrule Mother's third issue.

## C.     Father's Issues on Appeal

In his three issues, Father argues that the trial court erred by finding that the order terminating his parental rights was based on the agreement of the parties; that the trial court erred by finding that he knowingly and voluntarily signed the affidavit of relinquishment without any evidence of fraud, duress, or coercion; and that the trial court abused its discretion by "denying the Motion for New Trial."

As discussed above, Father did not file a motion for new trial. And even though Father testified at Mother's motion for new trial hearing, Father never once made an objection to his perceived lack of an agreement of the parties, and he never asked the trial court to make a determination regarding the voluntariness of his own

25

relinquishment affidavit or whether he signed it under coercion or duress. Thus, Father has not preserved these arguments for our review. *See* Tex. R. App. P. 33.1(a); *see also In re D.E.H.*, 301 S.W.3d at 827–28.

But even if we were to assume that Father's participation in Mother's motion for new trial hearing and the trial court's making a finding that Father had voluntarily executed his affidavit somehow preserved these issues for our review, we still conclude that Father is not entitled to the relief he seeks.

As to his first issue, that the trial court erred by finding that the order terminating his parental rights to M.S. was based on the agreement of the parties, Father is barred from bringing this issue on appeal. Indeed, the order terminating Father's parental rights to M.S. is based on his relinquishment affidavit. Accordingly, Father cannot make any arguments on appeal except arguments relating to fraud, duress, or coercion in the execution of the affidavit. *See* Tex. Fam. Code Ann. § 161.211(c). As Father's first issue does not relate to fraud, duress, or coercion in the execution of his affidavit, Family Code Section 161.211(c) bars this issue from appeal. *See Moore v. Brown*, 408 S.W.3d 423, 438–39 (Tex. App.—Austin 2013, pet. denied) (reasoning that Family Code Section 161.211(c) barred argument that termination order violated Virginia court's exclusive jurisdiction under the uniform code because the issue was not one of fraud, duress, or coercion in the execution of affidavit). We overrule Father's first issue.

As to his second and third issues, which are intertwined, we conclude that the trial court did not err by finding that Father knowingly and voluntarily—without the influence of fraud, duress, or coercion—executed his affidavit of relinquishment to M.S.

Here, Father's affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with Section 161.103 of the Family Code and, therefore, is prima facie evidence of its validity. *K.D.*, 471 S.W.3d at 174. Thus, the burden was on Father to prove, by a preponderance of the evidence, that his affidavit was procured by fraud, duress, or coercion. Father failed to carry his burden.

Father argues that he provided a preponderance of evidence to the trial court that his signing the relinquishment affidavit was the result of fraud, duress, or coercion and was therefore involuntary. Specifically, Father claims that he testified at the motion-for-new-trial hearing that he did not have a choice but to sign his affidavit, that the Department would take his son who was not a child of this suit if he did not sign his affidavit, and that both his and Mother's attorneys pressured him into signing the affidavit. We disagree that Father presented this evidence.

Our review of Father's testimony reveals that Father never made a statement that he had "no choice" other than to sign his affidavit. What Father testified was that Mother "felt like she had no other choice" but to sign her relinquishment affidavit and that he had urged Mother to sign her affidavit "because of [A.G.] because we didn't have a choice." Both of these statements about "choice" were

27

testimony regarding Mother's signing her affidavit, not Father. Thus, there is no evidence that Father felt he had no choice but to sign *his* affidavit.

Likewise, Father's statement about the Department possibly taking his child, who was not a child of this suit and is not Mother's biological son, was also testimony regarding Mother's affidavit and not Father's. Specifically, Father testified that "she was told that she needed to sign it, or they could come in and take my son [] and that she would never see [A.G.] again, [and] that she needed to salvage that relationship." Therefore, Father's statement about the Department taking his son was in direct reference as to why Mother signed her affidavit. And Father's statement about both attorneys pressuring him was again testimony specific to Mother and the voluntariness of her signing her affidavit. At the end of Father's testimony, the following exchange occurred:

[Mother's attorney]: Did you pressure [Mother] at all to sign it?

[Father]: No. I just told her that she needed to really think about it and think about [A.G.] as well.

[Mother's attorney]: I'd pass the witness.

[Father]: []Gayden and [Father's trial counsel] both were pressuring me to pressure her.

[Mother's attorney]: I'll pass the witness.

As can be seen from the context of this exchange, Father did not testify that his and Mother's attorneys pressured *him* to sign *his* own affidavit; rather, Father averred that the attorneys pressured him to pressure Mother to sign her affidavit. Simply put,

28

there is no evidence from this record to support that Father provided the evidence he claims that he did. Thus, without any evidence produced by Father that his signing of his affidavit was the result of fraud, duress, or coercion, Father has failed to meet his burden to overcome the prima facie evidence of the validity of his affidavit. *K.D.*, 471 S.W.3d at 156. Therefore, the evidence is sufficient to support the trial court's finding that Father signed his affidavit voluntarily and without coercion or duress, and the trial court did not abuse its discretion by denying Mother's motion for new trial. We overrule Father's second and third issues.

## IV. CONCLUSION

Having overruled Mother's three issues on appeal and having overruled Father's three issues on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: April 22, 2019